Argued and submitted November 18, 2009, affirmed June 9, 2010

Maru KRAMER
and Jeffrey Kramer,
*Plaintiffs-Respondents,*

*v.*

THE DALTON COMPANY, LLC;
Dalton Construction, Inc.;
The LF Dalton Gang, LLC;
and Len Dalton,
*Defendants,*

*and*

Steven DALTON,
*Defendant-Appellant.*

Washington County Circuit Court
C071896CV; A138774

234 P3d 1008

Stephen A. Redshaw argued the cause for appellant. With him on the briefs was Stoel Rives LLP.

Mark McCulloch argued the cause for respondents. With him on the brief were Keith Shepherd and Powers, McCulloch & Bennett, LLP.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

This case involves the interpretation of restrictive covenants that govern certain lots in a residential development known as Equestrian Heights. Plaintiffs and defendant own different parts of Lot 4 in that development; plaintiffs own the southern part, and defendant owns the northern part. On his part, defendant proposed to build a water treatment facility, retaining wall, and parking spaces, in order to benefit row houses that he intended to build as part of a subdivision on adjacent property. Plaintiffs filed this action seeking a declaration that the proposed construction is prohibited by the Equestrian Heights Protective Covenants. The trial court granted that relief, concluding that, under the terms of the covenants, any use of Lot 4 must serve the residence on that lot rather than residences (as opposed to, say, businesses) in general. Defendant appeals, arguing that the trial court misconstrued the covenant language. We affirm.

Equestrian Heights is a platted subdivision consisting of 13 lots. Plaintiffs own the southern part of Lot 4 of that subdivision and have a single-family residence on the lot. Defendant owns the northern part of Lot 4, as well as the neighboring lot to the east, Lot 2. Defendant intends to develop his property—that is, the northern part of Lot 4 and all of Lot 2—as the Saratoga subdivision. The plans for the Saratoga subdivision initially included six row houses, five of which were to be located exclusively on Lot 2; on the northern part of Lot 4, defendant intended to construct one of the row houses, two parking spaces, a water treatment facility (a bioswale), and a retaining wall, all of which would serve the Saratoga subdivision.

Plaintiffs opposed defendant's development of Lot 4. They filed this action to enjoin the proposed construction of the row house, parking spaces, bioswale, and retaining wall on the lot on the ground that the Equestrian Heights Protective Covenants prohibit such construction. Those covenants, by their terms, govern Lots 4 through 13 of the Equestrian Heights subdivision. Article I of the covenants is entitled "Residential Covenants." Section 1 of that article provides:

"Land Use and Building Type:

"No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one single family dwelling not to exceed two and one-half stories in height and a private garage for not less than two cars. The foregoing provisions shall not exclude construction of private greenhouse, storage unit, private swimming pool or shelter or port for the protection of such swimming pools, or for the storage of a boat and/or camping trailer kept for personal use, provided the location of such structures is in conformity with the applicable municipal regulations, and is compatible in design and decoration with the residence construction on such lot, and has been approved by the Architectural Control Committee.

"The provisions of this section shall not be deemed to prohibit the right of any home builder to construct residences on any lot, to store construction materials and equipment on said lots in the normal course of construction, and to use a single family residence as a sales office or model home for purposes of sale in EQUESTRIAN HEIGHTS."[1]

Plaintiffs moved for summary judgment on the question whether the "one single family dwelling" restriction in that section of the covenants prohibited defendant from constructing a second house on Lot 4. The court ruled that it did—a ruling that defendant does not challenge on appeal. The remaining issues regarding the effect of the covenants as to the parking spaces, bioswale, and retaining wall were then tried to the court, which ruled in plaintiffs' favor:

"* * * It is clear from [the context of the covenants as a whole] that the language is designed to protect the character and integrity of the development of these 10 single family residences. The context requires that the term 'residential purposes' in the covenant be interpreted in conjunction with the remaining sentences of paragraph 1 and the other provisions of the document. It is clear from that context that 'residential purposes' means relating to the residences in the development and not a broader definition of 'relating to

---

[1] As noted, defendant's other property, Lot 2, is not subject to the covenants; hence, the multiple dwellings on the same lot.

any residential purpose.' I don't find it persuasive that the restrictions are broad enough to include the allowance of purposes relating to some other residences, such as adjacent homes. The entire purpose of such a covenant is to limit and control the use of the lots for anything other than the one single family dwelling per lot and the normal and typical uses of such a single family.

"I find that these restrictions control all three of Defendant's suggested uses for the property, the bioswale, the retaining wall and the parking. It is arguable that the bioswale and its wall have a 'residential purpose' at all, but in the end, each of these uses relate to uses by residences other than those protected by the covenant. The fact that the runoff water from the Equestrian Heights area above the proposed Saratoga development may also run through the bioswale does not change this analysis. The covenant provides for utility and drainage easements to accomplish this purpose and such drainage changes are not needed but for the new development."

The court then entered a judgment "declaring that the Protective Covenants control and limit the use of subject lots for anything other than one single family dwelling per lot and the normal and typical uses of such a single family"; the judgment further enjoined construction "on Lot 4, including a residence, home, dwelling, water treatment facility, bioswale, retaining wall, or vehicular parking spaces, that does not directly relate to or benefit the existing residence, plaintiffs' home, which is protected by the Protective Covenants."

Defendant appeals that judgment, arguing that the trial court misinterpreted the Equestrian Heights Protective Covenants—more specifically, the restriction that "[n]o lot shall be used except for residential purposes." Our task, then, is to determine the correct meaning of the covenant language, using the method described in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997). We begin by examining the text of the disputed provision in the context of the document as a whole. *Id.* at 361. If the meaning is clear, our analysis ends. *Id.* If, however, we determine that the language of the restrictive covenant is ambiguous, our next step is to examine extrinsic evidence of the contracting parties' intent. *Id.* at 363. If the ambiguity cannot be resolved after considering

that evidence, we turn to maxims of construction. *Id.* at 364. The maxim ordinarily applied in this context is that restrictive covenants are to be construed strictly. *E.g.*, *id.* at 366.

■          We start, then, with the text at issue: "No lot shall be used except for residential purposes." The parties' dispute turns on two words in that sentence: "residential purposes." Plaintiffs contend—as the trial court concluded—that those words, read in the context of the document as a whole, unambiguously require that any use of the lot be related to the existing residence on Lot 4. Defendant, on the other hand, contends that such a restriction does not appear in the text of the covenants and cannot be inserted by the court. ORS 42.230 ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted[.]").

This is not the first time Oregon courts have been asked to interpret the phrase "residential purposes" in a restrictive covenant. In fact, *Yogman* itself involved a covenant restriction that "[a]ll lots within said tract shall be used exclusively for residential purposes * * *." 325 Or at 360. The court's discussion of the phrase "residential purposes," albeit in a different context, provides a helpful starting point for our analysis:

"We proceed to consider the text and context of the restrictive covenant at hand. We first address whether defendants' rental activity violates the requirement that the property 'be used exclusively for residential purposes.' 'Residential' means, as relevant, 'used, serving, or designed as a residence or for occupation by residents * * *[;] of, relating to, or connected with residence or residences.' *Webster's Third New Int'l Dictionary* 1931 (unabridged ed 1993). In turn, 'resident' refers to 'one who resides in a place: one who dwells in a place for a period of some duration.' *Ibid.* 'Residence' is defined as 'the act or fact of abiding or dwelling in a place for some time: an act of making one's home in a place * * *[;] the place where one actually lives or has his home as distinguished from his technical domicile * * *[;] a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished

from a place of temporary sojourn or transient visit * * *[;] a building used as a home: DWELLING.' *Ibid.*"

325 Or at 362.

The "ordinary meaning of 'residential,' " the court explained, did not resolve the parties' dispute as to whether rental activity constituted a "residential purpose." *Id.* For that reason, the court turned to the "context of the disputed provision." *Id.* at 363. However, "[n]one of the other provisions relate[d] to short-term rentals or elaborate[d] on any portion of the disputed provision. Thus, the provision remain[ed] ambiguous after an analysis of its text in context." *Id.* At that point, the court proceeded to analyze extrinsic evidence of the contracting parties' intent (which the court described as "sketchy") and, finding little help there, resolved the case based on the maxim that restrictive covenants are to be strictly construed. *Id.* at 364-66.

Here, as in *Yogman*, the text, read in isolation, does not resolve the parties' dispute regarding the meaning of "residential purposes." As noted in *Yogman*, the ordinary meaning of the term "residential" is "used, serving, or designed as a residence or for occupation by residents," or "relating to, or connected with residence or residences." *Webster's Third New Int'l Dictionary* 1931 (unabridged ed 2002). Thus, a covenant that a lot be used exclusively for "residential purposes" could plausibly refer to a use that serves or is connected to *any* residence or residences, or it could mean a use related to, connected to, or serving particular residences.

But that is where the similarity to *Yogman* ends. In that case, the context of the document as a whole was unhelpful, whereas the context of the restriction at issue here leaves only one plausible interpretation: that each lot must be used exclusively for purposes related to the single-family dwelling *on that lot*—the only "residence" permitted or even countenanced by the covenants. The restriction that "[n]o lot shall be used except for residential purposes" is within an article of the covenants entitled "Residential Covenants." And within that article, it falls under the heading "Land Use and Building Type." The covenant, as its heading suggests, addresses two interrelated issues—land use and building type—that are

specific to residences on Lots 4 through 13 of Equestrian Heights.

Immediately following the restriction that no lot be used except for "residential purposes," the covenant states that "[n]o building shall be erected, altered, placed or permitted to remain on any lot other than one single family dwelling not to exceed two and one-half stories in height and a private garage for not less than two cars." The covenant then provides exceptions to that building limitation:

> "The foregoing provisions shall not exclude construction of private greenhouse, storage unit, private swimming pool or shelter or port for the protection of such swimming pools, or for the storage of a boat and/or camping trailer kept for personal use, or for the storage of a boat and/or camping trailer kept for personal use * * *."

Each of the listed exceptions to the building limitation is a structure appurtenant to a single family dwelling, used by *that* dwelling; in fact, the covenant specifically allows only "private" greenhouses and swimming pools as well as various structures related to "personal use." In other words, the "use" of the property cannot be divorced from the "building type" under Article I, section 1, of the protective covenants, and in each instance, the only allowed "use" is one related to the single-family dwelling on that lot. That context, in our view, demonstrates that a "residential purpose" is a purpose related to the single-family dwelling on the lot.

The combination of "land use" and "building type" in a single section of the restrictive covenants is particularly telling given that the covenants deal separately with other prohibited "uses" of the land. Article I, section 4 of the covenants governs "Business and Commercial Uses":

> "No trade, craft, business, professional, commercial or similar activity of any kind shall be conducted on any lot, nor shall any goods, equipment, vehicles, materials or supplies used in connection with any trade, service or business be kept or stored on any lot, excepting the right of any home builder and the Declarant to construct residence on any lot [*sic*] to store construction equipment and materials on said lots in the normal course of said construction and use any

single family residence as a sales office or model home for purposes of sales in EQUESTRIAN HEIGHTS."

Had the drafters of the covenants intended the phrase "residential purpose" to refer to a purpose that serves *any* residence—that is, to simply distinguish an allowed "residential" use more generally from a commercial or business use—the more logical placement of that language would have been in section 4. But the drafters did not put it there. Instead, they imposed the "residential purposes" requirement within a section that tied the use of the property to certain residences— *i.e.*, the single-family dwellings on the lots within the subdivision.

Given that broader context, we are not persuaded that defendant's interpretation of the restrictive covenants is a plausible one. Although the ordinary meaning of the phrase "residential purposes" could, when read in isolation, refer to a purpose related to *any* residence, the text here is not isolated. Given the remainder of Article I of the protective covenants, it is readily apparent that the "use" of any one of lots 4 through 13 of Equestrian Heights must be connected to the single-family dwelling on that lot.[2]

■ Here, defendant's proposed uses of the property— parking spaces, bioswale, and retaining wall—were for the benefit of the Saratoga subdivision and were not appurtenant to the existing single-family residence on Lot 4; indeed, the owners of the existing residence on Lot 4 opposed the construction. For that reason, we agree with the trial court's decision to enjoin the proposed construction of the parking spaces, bioswale, and retaining wall, on the ground that such construction would violate the terms of the Equestrian Heights Protective Covenants.

Affirmed.

---

[2] For that reason, we need not resort to extrinsic evidence of the parties' intent (which, frankly, is unhelpful in any event) or relevant maxims of construction.